**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------**X**          07 CV 0345 (NG) (CLP)
**TIMOTHY D. WATSON,**

                                   **Petitioner,**

          **-against-**                                                   **OPINION AND ORDER**

**THE HONORABLE PETE GEREN,**
**Acting Secretary of the Army,[1]**

                                   **Respondent.**
----------------------------------------------------------------**X**

**GERSHON, United States District Judge:**

          Petitioner Timothy D. Watson, a Captain in the U.S. Army Reserve, Individual Ready

Reserve ("IRR"), applies to this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241,

challenging his custody by the U.S. Army. Specifically, petitioner challenges the Army's denial of

his application for discharge as a conscientious objector. For the reasons set forth below,

petitioner's application for a writ of habeas corpus is granted.

                                              **FACTS**

          In June 1998, while attending medical school, petitioner applied to the Army for financial

assistance under the U.S. Army Health Professions Scholarship Program ("HPSP"). The Army

offered petitioner an HSPS scholarship in exchange for his commitment to serve one year on active

duty for each year of funding received and to remain in the Army Reserve for five years thereafter.

On June 30, 1998, petitioner signed a service contract with the Army incorporating those terms. At

---

[1] When petitioner filed the instant petition, he named Francis D. Harvey, then the Secretary
of the Army, as respondent. Mr. Harvey has since tendered his resignation. On March 7, 2007, Pete
Geren became the Acting Secretary of the Army. Pursuant to Rule 25(d)(1) of the Federal Rules of
Civil Procedure, Mr. Geren is automatically substituted as respondent.

that time, he was not opposed to participating in war or serving as an Army officer. Petitioner subsequently received HPSP funds for three years, thereby obligating him to serve three years on active duty upon completion of his medical studies. Afterwards, but while still in medical school, petitioner served on active duty several times while performing clinical rotations at military medical facilities.

After graduating from medical school, petitioner entered a one year internship program in internal medicine and, afterwards, enrolled in a residency program in radiology. In 2001, the Army deferred petitioner's active duty obligation for five years so that he could complete his residency. Petitioner received no HSPS funding during that time.

On January 3, 2006, as his residency training was nearing completion, petitioner filed with the Army a 26-page application for discharge as a conscientious objector ("CO"), pursuant to and in accordance with Army Regulation 600-43. In his application, petitioner declared that he is opposed to participating in war in any form. He also addressed, in detail, the nature and evolution of his beliefs, the timing of their development, and the ways in which they have altered his lifestyle. First, petitioner outlined his opposition to participating in war:[2]

> I believe that warfare is immoral. I cannot participate in warfare or support warfare in any form. I cannot kill other human beings or assist those that do. My position stems from my moral, ethical and religious beliefs regarding the sanctity of human life, the power of non-violent resistance, and the role I have been called to play, and have chosen to play, in my journey through this precious and extraordinary life. I have given these issues profound thought over the past few years, and continue to give them profound thought, and my firm conclusion is that I cannot be a soldier. I cannot kill other human beings or assist those who do. I cannot support institutions that kill and make war. I prefer going to jail over killing or being part of an

---

[2] All quotations are reproduced exactly as they appear in the record, without any corrections. Filed with the court in four volumes, the administrative record is hereinafter referred to as "A.R.", followed by the corresponding volume number.

institution that kills. I prefer to die than to kill.

Furthermore, as preparation for war and the conduct of warfare are the defining principles of military service and training, I no longer consider my work as a physician congruent with active participation in any military organization. I am morally opposed to participation in military activities of any kind. My work as a physician is in direct opposition to the purpose of all armed forces and the prospect of my future employment as a physician in the Army Medical Corps is utterly incompatible with my beliefs regarding war, justice and God.

Participating in the care of injured active service members, thereby speeding their recovery and return to active military operations, results in the functional equivalent of weaponizing human beings. Because war is inherently inaccurate, collateral injuries to noncombatants are inevitable; my future participation in the Army would result in a perversion of my training and work as a doctor. In the Army, my work to heal would result, however indirectly, in the infliction of unnecessary wounds and loss of life. I cannot in good conscience justify these results, and will not voluntarily participate in them.
. . . .

I am no soldier; and I am no longer a physician who will work for an institution of war.

A.R. 3 at 12-13. Petitioner then explained how his opposition to war has developed over time.

Specifically, he stated that the events of September 11, 2001, and the United States' subsequent

military response, served as an impetus for his changed belief system:

The tragedy of September 11, 2001 and our subsequent response in Afghanistan and Iraq have been profound catalysts for introspection, and constitute a radical turning point in my life. These ongoing events have led me to reconsider many of my views on life, God, religion, government, politics, and ultimately my role as a human being here and now on this small planet.

We live in a radically different world than we did before September 11, 2001 and our response with wars in Afghanistan and Iraq, and I am a changed person as a result. These ongoing wars, and the mass death and deconstruction resulting from them, have led me to more fully comprehend the immorality, cruelty and arbitrariness of violence in general, and particularly the futility of violent retaliation. They have led me to detest violence and reject it completely.
. . . .

A significant part of my response to these horrific events was to learn more about

3

violence, the causes of violence, and alternatives to violence. They also caused me to search deeply within myself and to question my beliefs about life, death, warfare, violence and God.

A.R. 3 at 14. According to petitioner, his developing views against warfare began to crystallize, from late 2004 into 2005, into a firm belief that he could not participate in war in any form:

My decision began to take form in late 2004. Through a culmination of readings, meetings, discussions and other experiences, my beliefs crystallized by early Summer 2005. I knew then that I could never be a soldier, bear arms, kill other human beings, or lend my efforts and talents in support of institutions that wage war.

A.R. 3 at 16.

In detailing his opposition to war, petitioner listed various sources from which his beliefs derive. He cited Jesus of Nazareth, Martin Luther King, Jr., and Mohandas Gandhi, among others, as primary influences. In addition, he pointed to various religious and philosophical tenets as having contributed to his belief in non-violence:

I was raised Lutheran. I was raised with the teachings of Jesus, as depicted in the Gospels, of which the defining principle is love. "This is my commandment: that you love one another as I have loved you (John 15:12). This principle is also a tenet of Islam: "The source of all compassion (God) will endow with love – His love, the love of fellow being, and a capacity to love all – true believers who work for the common good" (Qur'an 19:16).

I whole-heartedly agree with Martin Luther King, Jr., when he said, "I am convinced that love is the most durable power in the world. It is not an expression of impractical idealism, but of practical realism. Far from being the pious injunction of a Utopian dreamer, love is an absolute necessity for the survival of our civilization. To return hate for hate does nothing but intensify the existence of evil in the universe. Someone must have sense enough and religion enough to cut off the chain of hate and evil, and this can only be done through love."

For me a future in the military represents a path toward hate as well as a denial of what I now know to be true. "This is my commandment: that you love one another as I have loved you" (John 15:12). My goal is to build a life founded on this type of universal brotherly love; I choose to walk a path of forgiveness and love. This I believe cannot be achieved through participation in any military organization.
. . . .

4

It is my strongest desire to have a positive effect in the world and I do not know to what degree Christianity is to be a vehicle for this, but pursuing that goal while participating in any military institution for me is antithetical and morally corrupt. I believe Dr. King was absolutely correct when he said, "Nonviolence is a powerful and just weapon, one which cuts without wounding and ennobles the man who wields it. It is a sword that heals." I am a healer and no soldier, and I cannot deny which is more righteous and just to me now.

The philosophies of the East have also been sources of great inspiration. From Hinduism and Gandhi to Islam and the Chinese philosophies of Buddha, Confucius, and Lao-Tse, I have discovered a seemingly universal and timeless, persistent human striving for meaningful living and spiritual enlightenment.

. . . .

In all of my readings, whether from the teachings of the ancient Vedic culture, the Qur'an or the philosophies of the Chinese spiritual masters, as in the more modern Christian text, strikingly absent from all these treatises on the meaning of life and how one should go about leading a good and meaningful one, is there the suggestion to solve one's problems and disagreements with others by taking up arms and slaying those that oppose you. From arguably mankind's most influential and lasting spiritual leaders and philosophers the use of violence is strikingly and consistently discredited as morally abject and spiritually void. Granted my study of the worlds great religions is relatively still in its infancy, but those leaders of men most widely admired and revered today overwhelmingly are not history's warmonger's but it's peacemakers. I choose to stand on the side of the peacemakers and will therefore not wear a military uniform ever again.

A.R. 3 at 14-15. Petitioner then indicated that his beliefs have altered his everyday life:

In addition to taking time to read the bible and research other religious texts, I have also joined and continue to participate in organizations of peace. I have marched in New York City and Washington, D.C., to stop the current war in Iraq. I have also become more politically aware and questioning. I actively seek out information from more varied sources about what is going on in my now larger world and how I might help. Where these investigations lead me and what additional decisions I reach because of them, I do not yet know.

. . . .

I strive everyday to reflect on my life and daily actions. I now consciously set aside time (usually before I go to sleep, but also sometimes in the early morning and sometimes throughout the day) for this reflection. This act might be called meditation by some or prayer by others. I see it as both. It is during these moments each day that I commit myself to the goal of having all my individual deeds (in all their means and ends and in their sum total throughout my life), to the best of my own ability, be derived from and hopefully ultimately express humble, selfless love

and goodwill.

. . . .

[M]y family and I marched in the September 24th march on Washington D.C. to end the war organized by United for Peace and Justice, as well as Act Now to Stop War and End Racism. I continue to support and participate with both organizations as much as I can. I have also recently joined Physicians for Social Responsibility, a Nobel Prize-winning organization with a historic mission of nuclear disarmament, gun control, and environmental issues that effect the health and well being of each of us. This is a group that I plan to participate more with in the future.

My professional goals have also changed because of my beliefs. I have decided to pursue a career in oncology imaging and intervention. This represents the area of medicine where I feel I can make the largest and most meaningful contributions. There are other less psychologically and physically demanding areas of radiology, but my skills are best suited for this particularly challenging field and I intend to fulfill my responsibility to do all I can to help others. Despite the additional workload and anxiety, by fighting cancer everyday, I feel I can do the most good through my work as a physician.

A.R. 3 at 16, 18, 19-20.

Concerning his sincerity in making his application for CO status, petitioner stated the following:

I also view this application as a conspicuous act of selflessness and morally sound goodwill. I make my request for conscientious objector status, solemnly and with full understanding of the potential consequences I am opening myself up to. I understand that I may forfeit all future benefits from the Veterans Administration. I understand I will be required to remit all costs incurred by the US Army for my medical training. I understand that the relationships with my family and friends will continue to be tested the rest of my life. I understand that I may be stigmatized by society at large for the rest of my life. I understand that I may be forced to choose between being a soldier and going to prison. And I certainly understand that being a military doctor for a few years is a far easier and more practical solution to this situation.

Regardless, these consequences are outweighed by the prospect of the use of my skill and any of my effort in participation with an organization that is directly opposed to my beliefs. No matter the difficulties this decision may bring, I will not voluntarily work for the U.S. Army, nor any other branch of the United States military. Affiliating myself and my work as a physician with any institution of war is morally unacceptable to me and I refuse to do so simply to avoid personal hardships.

. . . .

> As an offer of good faith to serve my country and to honor the larger contract I entered into with the U.S. government in 1998, I would fulfill my active duty obligation attending to the care of medically underserved populations throughout this country as a civilian physician via the United States Department of Health and Human Services Public Health and Indian Health Services, the Department of Veterans Affairs Health System or other institutions charged with the medical care of non-active duty military, civilian U.S. citizens.

A.R. 3 at 18-19, 21. Finally, petitioner summarized his overall opposition to warfare, and emphasized that he could not participate in military service:

> I can say with great accuracy and deeply held conviction that the only way I can be certain that my individual actions as a physician, American, and human being will not contribute to the additional and unnecessary loss of life and limb, American or otherwise, is by my non-participation in warfare and military service in any form.

A.R. 3 at 16.

In addition to his written application, petitioner submitted ten letters of support from family members and colleagues. All ten letters reference petitioner's outstanding character and honesty. One of his colleagues, Dr. Peter Nardi, for example, wrote: "Applying for conscientious objector status is not an easy thing to do, and I know Tim has searched deep within himself before coming to this decision. As to the question of his sincerity let there be no doubt this is a quality he has plenty of." A.R. 3 at 30. Dr. Robert F. Leonardo, the director of Interventional Radiology at Long Island College Hospital, echoed Dr. Nardi's sentiments: "I also firmly believe that Tim is very sincere in his beliefs and has been very consistent in his views in the time that I have known him. Thus, I fully support his decision to apply for conscientious objector status." A.R. 3 at 31. Another colleague, Dr. Daniel Resnick, succinctly endorsed petitioner's sincerity: "I am of the strongest opinion that his current desire to relieve himself of his Military responsibility is a deep felt ethically based decision that has been undertaken with the most sincerity." A.R. 3 at 36.

The letters authored by petitioner's parents also commend their son's veracity and overall character. Though they expressed some disappointment with petitioner's beliefs and decision to seek CO status, both George and Joyann Watson ultimately stated that they believe their son's decision was made with sincerity. Mr. Watson, a 65-year old retiree who served in the United States Army Reserve for seven years, made the following comments:

> I served in the United States Army Reserve from 1963-69 and am honorably discharged. I am proud of my service and loyal to my country and consider myself a patriot.
> . . . .
>
> Timothy's decision has been a hard one to accept. My beliefs are not totally his and his beliefs are not totally mine, but I want him to do what he feels is right. I believe in my son's honesty and sincerity and support him in whatever he deems correct.

A.R. 3 at 23. Mrs. Watson conveyed a similar message:

> I'm oh so shocked, surprised, disappointed & devastatingly frightened by my sons' decision.
> . . . .
>
> This freedom we all treasure is due in large part to our honored military . . . . Past, present & future ones.
>
> I support our veterans. I proudly honor them & am saddened by each and everyone of them lost or injured by war.
> . . . .
>
> I'm shocked to know my sons' objection are where they are now, after 9/11. I did not know he was marching for/or against anything in Washington, D.C. What I do know . . . . is this . . . . I do know my son is an honest, and sincerely thoughtful person. I have no doubt that his feelings about war are true. I do know my son to be a morally conscientious, scrupulous & painstakingly assiduous man in all his thoughts & actions; unremitting & persistent to always do what is right. And, when he said to me, this is my decision, there is no doubt in my mind that it is true.

A.R. 3 at 24-25.

Finally, petitioner's wife, Sharon Watson, submitted a letter in which she addressed the

integrity with which petitioner made his decision to seek CO status. Additionally, Ms. Watson explained the impact that petitioner's decision has had on their family:

> My family has always welcomed the addition of my husband to the family. I know that they were happy with the idea of my marrying a good man, a future doctor nonetheless, but they also admired Timothy's position as a future military officer. My father is a proud Korean War veteran, who has fond memories and stories of his service in the Army. My father's brother served in Vietnam and my father's uncle is Eugene Carroll – former rear admiral to the Navy (retired, now deceased). Predictably, the topic of Timothy's commitment to the Army invariable comes up when we get together with my father and it is undeniable the excitement and pride that my father has had in regards to our family's military service. Needless to say, Timothy's decision has not been looked on favorably by our family.

> I know my husband regrets the tremendous moral conflict he is now confronted with, as we both had previously looked upon his military obligation with much excitement and pride. I also know that his conviction is strong, sincere and deeply held, despite the unease this decision has meant for our interactions with our families and the potential for future complications it may mean for me and our son. I understand and support his decision.

> Timothy, I can assure you, did not reach the decision to apply for discharge as a conscientious objector quickly or lightly, but approached it like every other important decision in his life, with rigorous caution and careful, objective study.

A.R. 3 at 26.

In addition to addressing petitioner's veracity, the letters also detail the nature of petitioner's objection to war. Four of petitioner's colleagues specifically referred to his objection to war in any form, noting that petitioner has a "firm objection to participation in war," that "[h]is participation in warfare would be contrary to all moral beliefs he has expressed," that any "military involvement would create [for him] a true moral and ethical struggle," and that he has "increasingly argued passionately against . . . the futility of war." A.R. 3 at 33, 40, 31, 28 (letters from Dr. Christopher Coppa, Mr. Joseph Columbo, Dr. Robert F. Leonardo, Dr. Ira L. Reznik). Mr. Joseph Columbo put the matter most succinctly: "He has clearly and constantly expressed deeply held moral beliefs

against all war." A.R. 3 at 40. Sharon Watson, petitioner's wife, provided a similar statement, indicating that she has "witness[ed] the development of [petitioner's] beliefs against war and killing over the past few years." A.R. 3 at 27.

After petitioner's application was filed, the Army, on July 6, 2006, appointed Colonel Clinton R. O'Neill, III, to investigate and make a recommendation regarding petitioner's request for CO status. As required by AR 600-43, petitioner was then interviewed by a physician and a chaplain, both Army officers.[3] Petitioner was found fully capable of participating in the CO process by the physician on July 6, 2006. The chaplain's report, dated July 11, 2006, was unsupportive of petitioner's claim for CO status. Specifically, the chaplain questioned petitioner's "sincerity and depth of conviction":

> I might be convinced of his sincerity and depth of conviction if his view on the sanctity of human life included being asked to be removed from an abortion procedure or if given other examples of how his position has affected other aspects of his life or medical decision. He gave no such examples when asked.[4]

A.R. 2 at 14.

---

[3] Under AR 600-43, Ch. 2-2 - 3, a psychiatrist or other medical officer is to determine whether the applicant is mentally capable of participating in the CO application process, while the appointed chaplain is charged with evaluating the sincerity of the applicant's claimed beliefs.

[4] The chaplain also stated that "CPT Watson decided to apply for Conscientious Status after receiving a call from a representative in the Department of the Army that he was being processed for active duty." A.R. 2 at 14. Petitioner disputes this statement and contends that he submitted his application for CO status "months before he was notified of pending active duty orders." Petr.'s Reply Mem. at 8. The information available in the record appears to confirm petitioner's account. As indicated above, petitioner filed his application on January 3, 2006. The Army then contacted petitioner regarding his active duty reporting date by letter dated May 12, 2006. *See* Resp.'s Mem., Ex. F. In that letter, the Army ordered petitioner to report to temporary duty on July 3, 2006. *Id.* It is unclear, however, what became of petitioner's July 3, 2006 reporting date. As indicated below, *see infra* at 16, the Army eventually ordered petitioner to report to active duty on February 5, 2007. *See* Resp.'s Mem., Ex. D.

On July 12, 2006, however, the investigating officer, Colonel O'Neill, came to the opposite conclusion after conducting an informal hearing at which petitioner and his counsel were present. By memorandum bearing that date, Colonel O'Neill recommended that petitioner be classified as a conscientious objector and discharged from the Army. Colonel O'Neill made the following determinations:

> CPT Watson no longer believes in serving the military in any capacity and he feels very strongly that treating wounded soldiers and sending them back to fight results "in the functional equivalent of weaponizing human beings."
> . . . .
>
> [A]fter the tragedy of 11 September 2001, and the subsequent pre-emptive strikes in Afghanistan and especially Iraq, CPT Watson had an "Epiphany" and reevaluated his life, beliefs, and morale's.
> . . . .
>
> I believe he can and should be classified as a Conscientious Objector due to the extreme feelings and views he has expressed both in writing and verbally expressing his strong anti war bias, and refusal to treat combatant Soldiers. These beliefs will not change.
> . . . .
>
> CPT Watson is sincere in his moral and ethical beliefs. All evidence gathered in the conduct of this investigation indicates that he is consistent in his beliefs and that he is deeply convicted as to how he feels and conducts himself from day to day.

A.R. 2 at 4-5.

By letter dated July 18, 2006, petitioner submitted a three-page response to the investigative findings. In the letter, petitioner challenged the accuracy of the chaplain's report and corrected minor inaccuracies in the report of investigation. Petitioner's application, and the recommendations of the chaplain and investigating officer, were then reviewed by four army officers. Specifically, two members of petitioner's chain of command, Colonel Robert T. Marsh and Brigadier General John E. Sterling, Jr., issued recommendations after receiving advisory reports from their respective

legal advisors, Major Matthew D. Ramsey and Colonel Jerry J. Linn. Both legal advisors recommended disapproval of petitioner's application, and their commanding officers adopted their recommendations. All four officers based their recommendations on their findings that petitioner is not opposed to war in all forms. In addition, Colonel Marsh and his legal advisor, Major Ramsey, cited what they found to be petitioner's lack of sincerity as a basis for recommending denial. In making these findings, the officers pointed to certain facts in the record, as detailed below.

By memorandum dated September 18, 2006, Major Ramsey, Chief Judge Advocate and legal advisor to Colonel Marsh, recommended denial of petitioner's application for five separate, but related reasons. First, he suggested that the timing of petitioner's application evidences a lack of sincerity in petitioner's beliefs. Specifically, Major Ramsey recited petitioner's claim that his opposition to war became crystallized in the summer of 2005. He concluded that "[t]he timing of his declaration coincides with the end of his medical training . . . and his approaching entry on active duty . . . ." A.R. 1 at 30-31. Second, Major Ramsey found petitioner's beliefs to be insincere because of vagueness. After listing various sources that petitioner cited as inspiration for his belief in non-violence – including the teachings and philosophies of Dr. Martin Luther King, Mohandas Gandhi, the Dali Lama, Hinduism, Buddhism, Islam, Confucius and Lao-Tse – Major Ramsey concluded that petitioner's "alleged religious and/or moral rationale for conscientious objection is vague, insincere, and more of a general personal philosophy than a moral code by which CPT Watson lives his life." A.R. 1 at 31. Third, Major Ramsey found petitioner's claimed belief in the "sanctity of" and "commitment to" human life to be insincere. Specifically, he found those beliefs to be in contradiction to petitioner's "assertion that he will not treat Soldiers wounded in battle . . . ." A.R. 1 at 31. Major Ramsey also found petitioner's refusal to treat wounded soldiers to be "in

direct contradiction to the Hippocratic Oath." A.R. 1 at 31. He then concluded that "[t]hese contradictions highlight not only CPT Watson's lack of integrity, but demonstrate that his beliefs are neither sincere nor deeply held." A.R. 1 at 31. Fourth, Major Ramsey found that petitioner's alleged beliefs do not govern his actions:

> Other than claiming that he participated in a peace march, that he tries to consciously set aside time each day to reflect on his life and daily actions, and that he views his CO application as a 'conspicuous act of selflessness and morally sound goodwill,' CPT Watson has failed to demonstrate that or how his beliefs govern his actions in both word and deed.

A.R. 1 at 31. Finally, Major Ramsey found that petitioner is not opposed to all forms of war. Despite recognizing that "CPT Watson did state that he was opposed to all war," Major Ramsey concluded that petitioner's "primary or true opposition is to the war in Iraq." A.R. 1 at 32. In support of that finding, Major Ramsey noted that the peace march petitioner attended was "specifically focused on opposition to the war in Iraq as opposed to all wars." A.R. 1 at 32. He also stressed that "several of the statements submitted on behalf of CPT Watson specifically point out CPT Watson's opposition to the war in Iraq." A.R. 1 at 32.

On September 19, 2006, Colonel Robert T. Marsh recommended denial of petitioner's application, based entirely on three of the conclusions articulated in Major Ramsey's memorandum. Colonel Marsh reiterated Major Ramsey's findings that: (1) petitioner's claimed belief in the "sanctity of" and "commitment to" human life contradicts "his frank statement that he would not treat Soldiers wounded in battle," and is, therefore, "neither sincere or deeply held"; (2) "CPT Watson has failed to demonstrate that or how his beliefs govern his actions in both word and deed"; and (3) petitioner is not opposed to all war. A.R. 1 at 28-29.

By memorandum dated October 2, 2006, Colonel Linn, Staff Judge Advocate, and legal

advisor to Brigadier General Sterling, articulated one ground upon which he recommended denial of petitioner's application: "CPT Watson has not met the burden of establishing his opposition to war in any form."[5] A.R. 1 at 25. Specifically, Colonel Linn concluded that, "[w]hile CPT Watson professes to oppose participation in all wars, the evidence gathered in the packet indicates that CPT Watson's concern is truly with the war in Iraq and the political direction of the country . . . ." A.R. 1 at 25. In support of that conclusion, Colonel Linn cited several of petitioner's statements, made during various stages of the CO application process, in which petitioner expressed his "intractable unease" with and "relentless contempt and shame"for the Army's post-9/11 military actions. A.R. 1 at 26. In addition, Colonel Linn relied on selected language from letters that petitioner's colleagues and family submitted to the Army on petitioner's behalf. Specifically, Colonel Linn cited passages which refer to petitioner's disagreement with the Army's current course of action in Iraq. The statements cited, from both petitioner's personal statements and those made on his behalf, contain language suggesting that petitioner's view of war has fundamentally changed as a result of observing the military's response to 9/11. For example, Colonel Linn quoted petitioner's application as stating: "'our subsequent response to [to 9/11] in Afghanistan and Iraq . . . constitute[d] a radical turning point in my life.'" A.R. 1 at 26. Colonel Linn also quoted a letter authored by Dr. Christopher Coppa, one of petitioner's colleagues, in which Dr. Coppa "notes that our military

---

[5] In addition to this finding, Colonel Linn suggested that petitioner may have been disingenuous during the CO application process, based on two separate sets of facts. First, the colonel cited petitioner's statement that his friends had originally "'suggested fraudulent approaches' [that he could take to avoid reporting to active duty] such as feigning homosexuality or self-processing a medical discharge." A.R. 1 at 26. Colonel Linn then stated, "[i]t is unclear whether these are the same friends who . . . later vouched for [petitioner's] honesty and sincerity." A.R. 1 at 26. Second, Colonel Linn remarked that "CPT Watson's application is well-counseled and well-written." A.R. 1 at 27. He continued: "[It] closely traces the language, and incorporates the elements, of successful appeals of CO denials recorded in case law." A.R. 1 at 27.

strategy following 9/11 'served as an impetus for, or contributed to, Dr. Watson's firm objection to participation in war.'" A.R. 1 at 26.

The last officer to review petitioner's application was Brigadier General Sterling. On October 5, 2006, Brigadier General Sterling recommended denial of petitioner's application, based solely on the argument advanced by Colonel Linn, that petitioner's "asserted objection to war is an objection to the war in Iraq and our current national policy." A.R. 1 at 23. In arriving at that conclusion, Brigadier General Sterling recited several of the same statements as did Colonel Linn.

By letter dated October 26, 2006, petitioner submitted a 15-page, detailed rebuttal to the adverse recommendations of the four army officers. Petitioner specifically challenged the conclusions reached by each of the officers as based on a "grossly selective reading and presentation of the evidence of this case." A.R. 1 at 5. More specifically, petitioner complained that "in many instances statements and quotations were lifted out of context" and that "[c]ontrary evidence simply was omitted from the memoranda." A.R. 1 at 5.

In response to the most often cited reason on which the officers based their recommendations of denial – that petitioner is opposed only to the Army's post-9/11 military actions – petitioner reiterated his "opposition to participation in war in any form." A.R. 1 at 5. He further stressed that an impartial review of the record makes it "abundantly clear that the terrorist attacks of 11 September 2001 and the subsequent military actions in Afghanistan and Iraq were key factors that ultimately led to the crystallization of his beliefs against warfare and his decision to apply for discharge as a conscientious objector." A.R. 1 at 5. Petitioner also challenged the other conclusions reached by Colonel Marsh and Major Ramsey – that his beliefs are insincere, not deeply held, and do not govern his actions – as lacking bases in fact. To the contrary, petitioner argued, the sincerity

of his deeply held beliefs, and his incorporation of them into his daily life, are borne out by an

impartial review of the record.

The entire package was then forwarded to the Department of the Army Conscientious

Objector Review Board ("CORB"), the sole decision-making authority for applicants requesting 1-0

CO status,[6] for final determination. On December 5, 2006, by a 2-1 vote, the CORB denied

petitioner's application in a one page memorandum, reading in whole:

> After thorough examination of the Case Record, the DACORB determined that the
> applicant did not present convincing evidence . . . that the applicant's stated beliefs
> warrant award of 1-0 status. CPT Watson's application is disapproved. Specifically,
> the board opined that:
>
> > DACORB Staff Judge Advocate – Recommended Disapproval
> > The applicant failed to demonstrate by clear and convincing evidence that he
> > has a firm, fixed and sincere objection to war in any form.
> >
> > DACORB Staff Chaplain – Recommended Approval
> > I believe CPT Watson's beliefs to be sincere and fixed. I recommend
> > approval of his request, although, he should be required to repay all monies
> > given him as part of his scholarship program.
> >
> > DACORB President – Recommended Disapproval
> > The application is not convincing. I am not drawn to believe in the
> > applicant's sincerity and find him to be disingenuous and the application
> > expedient.

A.R. 1 at 2. Apart from these statements, just quoted in their entirety, the CORB offered no

additional grounds or reasons for denying petitioner's application.

On January 17, 2007, Ms. Susan L. Reed, Office of the Surgeon General, U.S. Army,

provided petitioner with orders requiring him to report to Fort Stewart, Georgia, on February 5,

---

[6]     As explained in AR 600-43, Ch. 1-7, an applicant seeking discharge based on
conscientious objection applies for "1-0 status," while an applicant seeking reassignment to non-
combatant training and service based on conscientious objection applies for "1-A-0" status.

2007, for extended active duty. Two days later, on January 19, 2007, the Army, for the first time, provided petitioner with notice of the CORB's denial of his application for CO status and forwarded to him a copy of the CORB's decision. Petitioner then contacted Ms. Reed and inquired about how he could extend his active duty report date. Ms. Reed responded that such an extension was not possible.

On January 24, 2007, petitioner filed with this court a petition for a writ of habeas corpus, challenging the Army's denial of his application for discharge as a CO. On the same date, petitioner sought an order to show cause for a preliminary injunction enjoining the respondent from ordering petitioner to report to active duty pending a decision on his petition. The following day, this court, after hearing from both parties in open court, and by agreement, temporarily stayed petitioner's active duty report date to allow the government to respond to the petition. Oral argument was then heard on February 14, 2007.

## DISCUSSION

### I.     Requirements for Conscientious Objector Status

The standards for measuring the claims of in-service conscientious objectors are the same as the statutory tests applicable to pre-induction conscientious objectors. *Gillette v. United States*, 401 U.S. 437, 422 (1971). In order to qualify for classification as a conscientious objector, an applicant must demonstrate by clear and convincing evidence that he meets three requirements. First, he must show that he is conscientiously opposed to participation in war in any form. *Gillette*, 401 U.S. at 443. Second, the applicant must demonstrate that his beliefs are based on "religious training and belief," interpreted by the Supreme Court to include beliefs that are ethically or morally derived. *Welsh v. United States*, 398 U.S. 333 (1970); *United States v. Seeger*, 380 U.S. 163 (1965).

Third, he must show that his objection is sincere. *Witmer v. United States*, 348 U.S. 375 (1955). Where an applicant establishes a *prima facie* case of conscientious objection, the Army cannot deny his application unless it has a basis in fact, as described more fully below, for doing so. *See United States v. Stewart*, 478 F.2d 106, 112-113 (2d Cir. 1973).

## II. Standard of Review

In reviewing a decision denying conscientious objector status, a court must ascertain whether there is a "basis in fact" for the decision. *Ferrand v. Seamans*, 488 F.2d 1386, 1389 (2d Cir. 1973); *United States ex rel. Checkman v. Laird*, 469 F.2d 773, 778 (2d Cir. 1972). "The 'basis in fact' test is satisfied if there is objective evidence, even though not preponderant or substantial, to support the finding in question." *United States ex rel. Foster v. Schlesinger*, 520 F.2d 751, 755 (2d Cir. 1975). "Although this standard of review is a narrow one, it is not toothless." *Hager v. Secretary of Air Force*, 938 F.2d 1449, 1454 (1st Cir. 1991). When confronted with an absence of objective evidence, a court must find the board's denial to be lacking a basis in fact. *Checkman*, 469 F.2d at 778.

In evaluating whether a basis in fact exists for the Army's denial, the court must begin by examining the reasons given by the Army for its decision. Army regulations require that a statement of "reasons" be supplied to an applicant when his CO application is denied. *See* AR 600-43, Ch. 2-8(d)(3). Specifically, the regulations require that the CORB state its reasons for disapproval on the record, which is ultimately forwarded to the applicant. *Id.* The board's provision of reasons is essential to proper judicial review, as the Second Circuit has, on several occasions, emphasized:

> There has emerged an increasing awareness, that while the "basis in fact" standard implies a narrower judicial review than the conventional "substantial evidence" rule . . . the courts cannot shirk the review necessary to consider whether there was a deviation from requirements of the law.

18

. . . .

> The courts have come to reject decision-making in conscientious objector cases on unarticulated premises and to adhere to what is now the substantially universal rule that . . . decisions denying *prima facie* claims of conscientious objection cannot be sustained when the record does not sufficiently disclose the board's reasons for its finding.

*Checkman*, 469 F.2d at 779 (internal quotation marks and citations omitted). That the CORB must state its reasons on the record is "a meaningful requirement, and one that cannot meaningfully be satisfied by a bare recitation by the CORB of the ultimate [regulatory] criteria – which in the case of conscientious objection require (a) opposition to all war that is (b) ethically or morally derived and (c) sincerely held." *Id*. at 787. Thus, "the requirement is not satisfied by a board's mere conclusory statements of insincerity." *Stewart*, 478 F.2d at 113. Instead, "[t]he facts or factors relied upon by the board must be stated" to ensure that the board's decision is susceptible to review. *Id*.

Both the basis in fact doctrine and the regulation requiring the provision of reasons are "intended to limit the freedom of a court to substitute its judgment for that of an official or board by interposing its own weighing of the evidence." *Checkman*, 469 F.2d at 781. Indeed, the regulation establishes "a rule that emphasizes executive responsibility, and limits judicial substitution." *Id*. Accordingly, the CORB must "identify, and be reviewed on the basis of the salient underlying considerations and type of evidence relied on, for example letters from associates, reports of personal demeanor, and lateness in filing the application." *Id*. In sum, "the administrators must focus the court's attention on the reasons for the decision and the court must review it on those reasons." *Id*. The proper focus of a reviewing court, then, "is on the reasons given by the CORB and not on reasons that may come to light if and when a court rummages throughout the record in

an effort to reconstruct on what basis the board might have decided the matter." *Id*. at 783.

## III.    The Absence of Reasons in the CORB's Denial Memorandum

Because petitioner has established a *prima facie* case for CO status, it is incumbent on the CORB to point to a basis in fact, from the record, to support its decision. In denying petitioner's application, by a 2-1 vote, the CORB summarily stated that petitioner "did not present convincing evidence . . . that the applicant's stated beliefs warrant award of 1-0 status." A.R. 1 at 2. That statement undisputedly contains no reasons within the meaning of the Army's regulations and the caselaw addressed above. The Staff Judge Advocate and the CORB President, who recommended disapproval, provided statements in support for their individual decisions. I will address each one in turn.

The Staff Judge Advocate, in recommending disapproval, offered the following brief statement: "The applicant  failed to demonstrate by clear and convincing evidence that he has a firm, fixed and sincere objection to war in any form." A.R. 1 at 2. Such a "bare recitation by the CORB of the ultimate [regulatory]  criteria" does not meaningfully satisfy the rule that reasons must be stated on the record. *Checkman*, 469 F.2d at 787. Indeed, the Judge Advocate merely concluded that petitioner did not meet two of the three requirements necessary for obtaining conscientious objector status. He neither stated his reasons for arriving at that conclusion, nor did he "identify . . . [the] type of evidence [he] relied on" in making his determination. *Id*. at 781. Because the Judge Advocate's conclusory statement does not "focus the court's attention on the reasons for the decision," it runs afoul of AR 600-43, Ch. 2-8(d)(3), and the Second Circuit's interpretation of that regulation's mandate. *Id*. Accordingly, the Judge Advocate's decision is not susceptible to review under the basis in fact standard.

The CORB President also recommended disapproval of petitioner's application. Like the Judge Advocate, the President offered only a bare conclusion in support of her recommendation: "The application is not convincing. I am not drawn to believe in the applicant's sincerity and find him to be disingenuous and the application expedient." A.R. 1 at 2. The President failed to identify or even indirectly reference "the salient underlying considerations" that led to this determination. *Checkman*, 469 F.2d at 781. Instead, her statement appears to be nothing more than an articulated suspicion of petitioner's motives and sincerity. Such a "reason" is insufficient under the Second Circuit's interpretation of AR 600-43, Ch. 2-8(d)(3), as the regulation's "requirement is not satisfied by a board's mere conclusory statements of insincerity." *Stewart*, 478 F.2d at 113. Because the President's stated "reasons" are plainly insufficient, and because she fails to "focus the court's attention on the reasons for the decision," her finding, like that of the Judge Advocate, is not susceptible to review under the basis in fact standard. *Checkman*, 469 F.2d at 781.

Despite the contrary directives of the Second Circuit, the Army argues that the CORB need not set forth specific reasons for denying a CO application so long as the rationale underlying its decision is readily discernable. The Army contends that, here, the "bases for the DACORB decision are readily discernable" when one looks to the "bases in fact that were identified in the chain of command recommendations." Resp.'s Mem. 13. Accordingly, the Army concludes, the "reasons" set forth by the CORB were legally sufficient.

The Army's argument is based on a selective reading of *Checkman* that ignores the decision's fundamental point. *Checkman* made clear that, while the CORB is not required to articulate in evidentiary detail the reasons for its decision, it must articulate what those reasons are. If it does so, the court may review the record to see whether the reasons articulated have a basis in

fact.

The *Checkman* court sought to ensure meaningful judicial review of the military's C.O. decisions by requiring that the military services provide discernible reasons for their decisions. *Checkman*, 469 F.2d at 779. The court explained that, "[i]n the last analysis, what is comprehended by 'reasons' is itself governed by a rule of reason, but it is essentially a requirement that the salient facts [underlying the CORB's decision] be identified." *Id*. at 787. This rule of law was reiterated one year later, when the Second Circuit summarized its previous holding in *Checkman*:

> We have further recognized recently, in considering the "reasons" requirement in connection with review of an ROTC cadet's application for discharge as a conscientious objector, that the requirement is not satisfied by a board's mere conclusory statements of insincerity. *The facts or factors relied upon by the board must be stated.*

*Stewart*, 478 F.2d at 113 (emphasis added). At the very least, the requirement for reasons "cannot meaningfully be satisfied by a bare recitation by the CORB of the ultimate [regulatory] criteria". . . . *Checkman*, 469 F.2d at 787. Such a recitation simply does not adequately "focus the court's attention on the reasons for the [CORB's] decision . . . ." *Id*. at 781.

Applying the law of this circuit, I find that the CORB has failed to sufficiently set forth its reasons for denying petitioner's application. As previously noted, neither the Judge Advocate nor the CORB President provided any factual reason to support the general conclusion that petitioner failed to meet certain CO criteria. Respondent's argument that the bases for the CORB decision are discernable when one looks to the "bases in fact that were identified in the chain of command recommendations" is speculative and essentially invites the court to substitute its own judgment for that of the CORB. Resp.'s Mem. 13. Indeed, the chain of command recommendations contain a variety of different rationales which the four army officers variously relied upon in recommending

denial. Without having been guided by sufficiently stated reasons, I decline the Army's invitation to "rummage[] throughout the record in an effort to reconstruct on what basis the board might have decided the matter." *Id*. at 783. Doing so would inappropriately substitute this court's judgment for that of the Army.

## IV. There Exists No Basis In Fact for Denial In the Record

Even if I were to accept the Army's argument – that the "reasons" stated by the CORB adequately point to certain findings contained in the chain of command recommendations[7] – my review of those recommendations reveals no basis in fact for the board's denial.

### A. The Chain of Command Recommendations

As will be seen, each reason proffered by the reviewing officers is fundamentally flawed. I will address each one separately below.

### 1. Officers' Finding of Selective Opposition to War

Each officer in petitioner's chain of command found that petitioner was opposed to the war in Iraq and not to war in general. This finding was premised on two theories: namely, that petitioner's selective opposition to the war in Iraq is evidenced by (1) petitioner's statements, and statements made on his behalf, and (2) the fact that petitioner attended a peace march which was

---

[7] Respondent appears to rely solely on the chain of command recommendations as bases for the CORB's decision. *See* Resp.'s Mem. 16 ("These bases are summarized clearly and succinctly in the recommendations of Petitioner's chain of command."). Nonetheless, respondent later references the findings of the chaplain, and therefore seemingly invites this court to review his report for a basis-in-fact of the CORB's denial. *Id*. at 17 ("There is ample evidence in the record supporting the DACORB's denial of Captain Watson's application. The chaplain who personally interviewed Captain Watson concluded that his beliefs were not sincere."). I will address the "reasons" articulated by the chaplain in a separate section below.

"specifically focused on opposition to the war in Iraq as opposed to all wars."[8]  A.R. 1 at 32 (Ramsey Mem.).  Neither theory is sound.

### a)       Statements in the Record

An impartial review of the statements in the record does not bear out the officers' conclusion that petitioner opposes only the war in Iraq.  Rather, what is clear, after reviewing the record as a whole, is that all four officers misread the statements upon which they so heavily relied.

The language relied upon in the officers' reports was taken out of context and does not accurately represent petitioner's statements.  One officer, Colonel Linn, extracted and reproduced in his recommendation portions of petitioner's statements in which petitioner criticized the war in Iraq.  In doing so, Colonel Linn omitted accompanying language indicating petitioner's opposition to all war.  One example, representative of this practice, will suffice.  Colonel Linn, in recommending denial, cited the following from petitioner's application:  "'As a form of retaliation and under the pretense of national security, the United States military has invaded and occupied a foreign country in an unprecedented pre-emptive war'."  A.R. 1 at 26.  From this, Colonel Linn concluded that "CPT Watson is troubled mainly by the war in Iraq."  A.R. 1 at 26.  When viewed in whole, however, petitioner's statement takes on an entirely different meaning:

> As a form of retaliation and under the pretense of national security, the United States military has invaded and occupied a foreign country in an unprecedented pre-emptive war *and I have become a doctor who now views war as an unacceptable lapse of reason, the ultimate act of futility and an entirely shameful human endeavor*.

A.R. 3 at 13 (emphasis added).  The omitted portion of petitioner's statement makes clear that petitioner is opposed to war in general.  That petitioner first criticizes the war in which this country

---

[8] Only two officers, Major Ramsey and Colonel Marsh, advanced the second rationale, while all four officers relied on the first.

is currently engaged is neither surprising, in light of his beliefs, nor contradictory to his overall opposition to war. Indeed, petitioner's several statements decrying the war in Iraq "do not contradict his statements that he is opposed to war in general." *United States v. Garvin*, 438 F.2d 1054, 1057 (7th Cir. 1971) (finding applicant's several statements criticizing the Vietnam War consistent with his opposition to all war). Rather, his "[d]isapproval of war in [Iraq] or any other place is certainly consistent, rather than inconsistent, with conscientious objection to armed conflict." *United States ex rel. Lehman v. Laird*, 430 F.2d 96, 99 (4th Cir. 1970).

The officers' selective reading of petitioner's statements distorts the record and cannot establish a basis in fact supporting denial of his application. In contrast to the officers' findings, petitioner's application contains numerous declarations of his opposition to war in any form. Specifically, petitioner stated that he "believe[s] that warfare is immoral," that he is "morally opposed to participation in military activities of any kind," that he "cannot participate in warfare or support warfare in any form," and that he "could never be a soldier, bear arms, kill other human beings, or lend [his] efforts and talents in support of institutions that wage war." A.R. 3 at 12, 16.

Moreover, petitioner explicitly stated that the terrorist attacks of September 11, 2001, and the United States' subsequent military actions in Afghanistan and Iraq, were key factors that ultimately led to the crystallization of his beliefs against all warfare. Petitioner explained:

> These ongoing wars, and the mass death and deconstruction resulting from them, have led me to more fully comprehend the immorality, cruelty and arbitrariness of violence in general, and particularly the futility of violent retaliation. They have led me to detest violence and reject it completely.

A.R. 3 at 14. Any fair reading of this statement reveals petitioner's claim that his opposition to the wars in Afghanistan and Iraq ultimately evolved into an opposition to all war. In this regard, the facts of the instant case closely mirror those found in *Checkman*. There, the CORB's finding of

25

selective opposition was based on Checkman's statements, made about his initial views on war, which illustrated that, during his second year of law school, "the focus of his concern was on the war in Vietnam rather than on war in general . . . ." *Checkman*, 469 F.2d at 784. In rejecting the CORB's finding of selective opposition, the court recognized the evolution of Checkman's beliefs:

> Checkman's beliefs during his second year in law school do not relate to the relevant time period. His application describes his beliefs as having evolved from selective objection in his early law school period to total objection by the time of his last semester, the point in time at which his application was filed. This point is given emphasis by the settled law of this circuit concerning a recently matured conscientious objection – that the ascension to conscientious objection is a change in status, and the point in time when the beliefs form is a circumstance beyond the control of the individual involved.

*Id*. (internal quotations omitted). The facts here demand the same conclusion. In his application, petitioner specifically stated that his objections to the military's post-9/11 activities had evolved into a fully crystallized opposition to all war "by early Summer 2005," six months before he filed his request for CO status. A.R. 3 at 16. Thus, according to his written statement, petitioner held a firm opposition to all war at the time he submitted his application for discharge.

In addition to having relied on petitioner's statements, all four officers cited to language contained in the letters submitted on petitioner's behalf as support for their findings of selective opposition. Here too, the officers misconstrued the statements upon which they relied.

By cherry-picking passages in which several authors characterized petitioner as critical of the war in Iraq, and reading them in isolation, the officers concluded that petitioner's "primary or true opposition is to the war in Iraq," as opposed to war in general. A.R. 1 at 32 (Ramsey Mem.). In fact, however, not one of petitioner's colleagues or family members stated that petitioner is opposed only to the war in Iraq. Where the various authors did refer to that war, they did so either to illustrate petitioner's opposition to war in general, or to explain the evolution of petitioner's anti-

war beliefs.  For example, Dr. Christopher Coppa stated the following:

> [Petitioner] questions the utility of preemptive strikes as a mechanism for protecting a country, and deems the destruction and casualties resulting from war as morally detestable.  Could the defense strategy of the U.S. following 9/11 have served as an impetus for, or contributed to, Dr. Watson's firm objection to participation in war? I definitely think so.

A.R. 3 at 33.  This passage is entirely consistent with petitioner's stated beliefs, namely, that he is opposed to participation in any war, and that his objections to the military's post-9/11 actions have contributed to and solidified his view that all warfare is immoral.

In addition, to have arrived at their conclusions, the officers had to have wholly discounted the numerous references to petitioner's opposition to all war.  Indeed, four of petitioner's colleagues explicitly noted that petitioner has a "firm objection to participation in war," that "[h]is participation in warfare would be contrary to all moral beliefs he has expressed," that any "military involvement would create [for him] a true moral and ethical struggle," and that he has "increasingly argued passionately against . . . the futility of war." A.R. 3 at 33, 40, 31, 28 (letters from Dr. Christopher Coppa, Mr. Joseph Columbo, Dr. Robert F. Leonardo, Dr. Ira L. Reznik).  Additionally, petitioner's wife reported that she had "witness[ed] the development of [petitioner's] beliefs against war and killing over the past few years."  A.R. 3 at 27.

In sum, the statements offered by petitioner, and his family and colleagues, do not support the officers' findings that petitioner is not opposed to all war.  Accordingly, this finding provides no basis in fact for denial of petitioner's application.

### b)      Petitioner's Participation in the 2005 Peace March

In further support of their findings of selective opposition, two officers, Major Ramsey and Colonel Marsh, placed much significance on the fact that petitioner attended a peace march, in

September of 2005, which was "specifically focused on opposition to the war in Iraq as opposed to all wars." A.R. 1 at 32 (Ramsey Mem.). How the officers glean from this fact that petitioner is opposed only to the war in Iraq is unexplained. Petitioner's participation in a peace march directed at the war in which our nation is currently engaged does not logically support a conclusion that he is selectively opposed to only that war. If anything, petitioner's involvement in the march is a manifestation of the sincerity of his beliefs. As such, it cannot serve as a factual basis for the officers' finding of selective opposition.

Considering the lack of any evidence that petitioner is opposed only to the war in Iraq, and the affirmative evidence of his opposition to all war, I find the officers' conclusions of selective opposition to be lacking a basis in fact. *See Lehman*, 430 F.2d at 98 (after noting that, in his "application for discharge, [petitioner] gave no indication that he opposed only the Vietnam war and [that] he at one point directly stated that 'any war is immoral and unjustifiable,'" the court declared, "[i]n contrast to the scant innuendo of selective conscientious objection, there is direct positive evidence that [petitioner] is opposed to all wars.")

### 2. Officers' Determination of Insincerity

In addition to citing petitioner's alleged selective opposition to the war in Iraq, two officers, Major Ramsey and Colonel Marsh, based their recommendations for denial on findings that petitioner is insincere in his beliefs. In total, these officers forwarded four separate theories to that effect, finding insincerity based on: (1) the timing of petitioner's application; (2) the alleged vagueness of petitioner's stated beliefs; (3) the supposed inconsistency between petitioner's statement that he would not treat wounded soldiers in battle and his claimed belief in the "sanctity of" and "commitment to" human life; and (4) the officers' conclusion that petitioner's alleged beliefs

do not govern his actions. Major Ramsey articulated all four of these rationales in finding that petitioner is insincere, while Colonel Marsh relied on only the last two, namely, that petitioner's refusal to treat wounded soldiers is inconsistent with his stated beliefs, and that petitioner's alleged beliefs do not govern his actions.

### a) Timing of Petitioner's Application

Out of all the reviewing officers, only one, Major Ramsey, found the timing of petitioner's application to evidence the insincerity of his beliefs.[9] Major Ramsey recited petitioner's claim that his opposition to war became crystallized in the summer of 2005, and then remarked that "[t]he timing of his declaration coincides with the end of his medical training . . . and his approaching entry on active duty . . . ." A.R. 1 at 30-31. The major also found that petitioner's stated beliefs are "but a pretext to avoid his military commitment." A.R. 1 at 32.

While late application for CO status may be the basis for suspicion as to petitioner's sincerity, this alone cannot provide a basis in fact for denial of petitioner's application. *See Ferrand*, 488 F.2d at 1390. Indeed, "it is universally the law that late crystallization of conscientious objector convictions is not a sufficient basis in fact to reject the claim." *Hager*, 938 F.2d at 1455. *See also Shaffer v. Schlesinger,* 531 F.2d 124, 130 (3d Cir. 1976) ("cases are legion which hold that the

---

[9] At oral argument, respondent argued that the CORB President, in recommending disapproval of petitioner's application, referenced the late filing of petitioner's application when she stated: "I am not drawn to believe in the applicant's sincerity and find him to be disingenuous and the application expedient." *See* Oral Argument Tr. 12, Feb. 14, 2007. Specifically, respondent relies on the President's use of the word "expedient." This argument is without support. Webster's Dictionary defines expedient as "characterized by suitability, practicality, and efficiency in achieving a particular end," and "advantageous under the circumstances." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 799 (2002). Accordingly, the implication of the President's statement is that she believes petitioner to be disingenuously using the CO application process as a means to avoid military service. Her use of the word expedient, in and of itself, does nothing to implicate the timing of petitioner's filing as a basis for that belief.

timing of an application for conscientious objector status is not a sufficient basis in fact to support a finding of insincerity").  To the contrary, "a sincere conscientious objector is entitled to release from his service obligations whether his views crystallize late or early." *Lobis v. Sec'y of the United States Air Force*, 519 F.2d 304, 307 (1st Cir. 1975).

Petitioner filed his application for discharge a matter of months before he was scheduled to be called to active duty.  He did so after having accepted three years of Army funding, while attending medical school, and after receiving a five-year deferment from the Army to complete his post-graduate medical training.  That Major Ramsey views the late crystallization of petitioner's beliefs as suspiciously convenient is not surprising.  Indeed, the Army invested a considerable amount of time and money into recruiting petitioner's services and understandably expected him to fulfill the obligation he voluntarily entered into in 1998.  Nonetheless, petitioner has offered a reasonable explanation for the evolution of his beliefs and their late crystallization.  Accordingly, "[s]omething more tangible than suspicion is needed to support a finding of insincerity." *Lobis*, 519 F.2d at 307.  As will be seen, the officers fail to provide any additional, legitimate reason for disbelieving petitioner.  Therefore, the mere timing of his application does not provide a basis in fact for its denial.

### b)      Vagueness of Petitioner's Beliefs

Major Ramsey also found petitioner to be insincere because of the vagueness of his beliefs. After listing various sources that petitioner cited as inspiring his belief in non-violence – including the teachings and philosophies of Dr. Martin Luther King, Mohandas Gandhi, the Dali Lama, Hinduism, Buddhism, Islam, Confucius and Lao-Tse – Major Ramsey concluded that petitioner's "alleged religious and/or moral rationale for conscientious objection is vague, insincere, and more

of a general personal philosophy than a moral code by which CPT Watson lives his life." A.R. 1 at 31.

I am unable to discern the meaning of Major Ramsey's conclusion or the rationale he employed in arriving at it. The major provided no evidence in support of his finding of vagueness, which is undermined by even a casual review of the detailed personal statement that petitioner provided in his 26-page application for discharge. As illustrated by the citations above, petitioner devoted numerous pages of his application to detailing the genesis, nature, and evolution of his beliefs. Indeed, petitioner addressed, in detail, his belief in non-violence and the religious, moral, and ethical principles upon which his views are based. Petitioner's statement is replete with cites to sacred texts and other teachings used by petitioner to describe the nature and sources of his beliefs. In short, petitioner's application does not lack for detail. Accordingly, I find no basis in fact for Major Ramsey's conclusion that petitioner's stated beliefs are vague or evidence insincerity.

### c)     Petitioner's Refusal to Treat Injured Active Service Members

Both Major Ramsey and Colonel Marsh found petitioner's claimed belief in the "sanctity of" and "commitment to" human life to be insincere in light of petitioner's "assertion that he will not treat Soldiers wounded in battle. . . ."[10] A.R. 1 at 31. In addition, the officers found petitioner's refusal to treat wounded soldiers to be "in direct contradiction to the Hippocratic Oath." A.R. 1 at 31. The officers ultimately concluded that "[t]hese contradictions highlight not only CPT Watson's lack of integrity, but demonstrate that his beliefs are neither sincere nor deeply held." A.R. 1 at 31.

Petitioner's statement – that he will not participate in the care of injured active service

---

[10] While the passages reproduced in this and the following section are taken from Major Ramsey's memorandum, Colonel Marsh employed the same rationales in analyzing petitioner's statements and came to virtually identical conclusions.

members – is neither inconsistent with his claimed belief in the "sanctity of" and "commitment to" human life, nor in contradiction to his Hippocratic Oath. First, petitioner's refusal to serve as a medical officer is based on his opposition to warfare in any form and his view that, by refusing to participate in a practice that supports and enables warfare, he is withdrawing his support of institutions that wage war. Indeed, according to petitioner's own statement, it is precisely *because* of his belief in the sanctity of human life, and his commitment to it, that he refuses to serve as a medical officer:

> Participating in the care of injured active service members, thereby speeding their recovery and return to active military operations, results in the functional equivalent of weaponizing human beings. Because war is inherently inaccurate, collateral injuries to noncombatants are inevitable; my future participation in the Army would result in a perversion of my training and work as a doctor. In the Army, *my work to heal would result, however indirectly, in the infliction of unnecessary wounds and loss of life*. I cannot in good conscience justify these results, and will not voluntarily participate in them.

A.R. 3 at 12 (emphasis added). Accordingly, I find no basis in fact for the finding that petitioner's statements are inconsistent.

Second, there is no basis in fact for the conclusion that petitioner's refusal to serve as a medical officer contradicts his Hippocratic Oath. Petitioner explained that, because of his opposition to participation in war in any form, he would not voluntarily report to duty. By refusing to do so, petitioner leaves the task of caring for the wounded to someone whose beliefs do not prevent his or her participation in warfare. While officers Ramsey and Marsh may disagree with petitioner's reasons for refusing to serve, their conclusion that his decision violates his Hippocratic Oath does not logically follow. Accordingly, their finding of insincerity is not grounded in fact.

### d) Petitioner's Alleged Beliefs Do Not Govern His Actions

Finally, Major Ramsey and Colonel Marsh found that petitioner's alleged beliefs do not

32

govern his everyday actions:

> Other than claiming that he participated in a peace march, that he tries to consciously set aside time each day to reflect on his life and daily actions, and that he views his CO application as a 'conspicuous act of selflessness and morally sound goodwill,' CPT Watson has failed to demonstrate that or how his beliefs govern his actions in both word and deed.

A.R. 1 at 31. As a result, both officers concluded that petitioner's stated beliefs are not sincerely held.

First, "in cases involving in-service physicians," courts have suggested that petitioners need not affirmatively show changes in lifestyle to evidence their sincerely held beliefs:

> [A]n alleged failure to manifest . . . newfound convictions in a changed life-style seems of minor significance at best. His medical career was of a nature commonly supposed to be oriented towards public service, and there was no evidence, before or after crystallization, of habits or life-style incompatible with sincerely held CO beliefs.

*Hager*, 938 F.2d at 1457 (internal quotations marks and alterations omitted). *See also Goldstein v. Middendorf*, 535 F.2d 1339, 1343 n.6 (1st Cir. 1976); *Lobis*, 519 F.2d at 307 n.2. The same may be said of the evidence here. Accordingly, even if the record were devoid of facts evidencing petitioner's changed lifestyle, post-crystallization of his beliefs, it would not be fatal to his application.

Second, petitioner did indicate, in his application, that his newly crystallized opposition to warfare has caused him to alter his lifestyle. As cited, but summarily discounted, by officers Ramsey and Marsh, petitioner stated that he marched for peace in Washington D.C. in September of 2005, and that he now prays and meditates on a daily basis. Petitioner also reported that he now supports and participates in two peace organizations: United for Peace and Justice, and Act Now to Stop War and End Racism. Additionally, petitioner indicated that he recently joined Physicians

for Social Responsibility, "a Nobel Prize-winning organization with a historic mission of nuclear disarmament, gun control, and environmental issues that effect the health and well being of each of us." A.R. 3 at 20. Finally, and perhaps most significantly, petitioner stated that, in light of his beliefs, he has "decided to pursue a career in oncology imaging and intervention." A.R. 3 at 20. He explained that "[t]his represents the area of medicine where I feel I can make the largest and most meaningful contributions" and "do the most good through my work as a physician." A.R. 3 at 20. These examples, on their face, evidence changes to petitioner's lifestyle based on his beliefs, and the officers articulate no basis for rejecting them. Therefore, the officers' finding to the contrary lacks a basis in fact.

### B.    The Chaplain's Report

Because the Army relies, in its papers, on the chaplain's finding of insincerity, I will address his report despite the fact that I am unable to discern whether the CORB relied upon it. The chaplain's finding was articulated as follows:

> I might be convinced of [petitioner's] sincerity and depth of conviction if his view on the sanctity of human life included being asked to be removed from an abortion procedure or if given other examples of how his position has affected other aspects of his life or medical decision. He gave no such examples when asked.[11]

A.R. 2 at 14.

The chaplain's conclusion is doubly flawed. First, it appears that the chaplain, "contrary to the governing regulations, reached his conclusion based on the assumption that his own views on

-----

[11] The chaplain also noted that "CPT Watson decided to apply for Conscientious Status after receiving a call from a representative in the Department of the Army that he was being processed for active duty." A.R. 2 at 14. As noted above, this statement is disputed and lacks evidentiary support in the record. Moreover, to the extent that it suggests that the chaplain relied on the timing of petitioner's application in making his finding of insincerity, I reiterate that timing alone does not constitute a basis in fact for denial of a CO application. *See* discussion *supra* at 28-30.

[a] very delicate and controversial issue[] [was] the correct one[].” *Goldstein*, 535 F.2d at 1344 (concluding that it was improper for the investigating officer to find that petitioner was insincere in his opposition to war because petitioner “favored” abortion); *see also Hanna v. Sec'y of the U.S. Army*, No. 06-11434, 2006 WL 2925268, at *12 (D. Mass. Oct. 6, 2006) (holding that the chaplain’s finding of insincerity, based on his belief that a true conscientious objector would demand to be removed from a hospital that “destroys defenseless fetuses,” ran “afoul of the Army’s regulations”). Second, the chaplain’s finding is speculative. It is undisputed that he never questioned petitioner about his views on abortion or inquired as to whether petitioner would participate in such a procedure. That the chaplain found insincerity based on petitioner’s failure to raise the issue of abortion defies logic. Petitioner is a trained radiologist who was applying for CO status based on his opposition to war; that he did not refer to abortion during his interview cannot be said to evidence anything at all.

Finally, before interviewing with the chaplain, petitioner had already, in his application, given several examples of “how his position [against violence] has affected other aspects of his life or medical decision.” A.R. 2 at 14. Those examples, cited above, clearly contradict the chaplain’s finding. Accordingly, his conclusion that petitioner is insincere lacks a basis in fact.

## V.     The Army’s Effort, on this Petition, to Sustain the CORB’s Denial of CO Status

In its Memorandum of Law, the Army identifies two grounds for denial of petitioner’s application for CO status: “(i) The Timing of Petitioner’s Application Casts Doubt on His Sincerity” and “(ii) The DACORB Properly Concluded that Petitioner is Not Sincerely Opposed to All Wars.” The court has already concluded that none of the factual bases relied upon by any of the reviewing officers, or the chaplain, constitute a valid basis in fact for the CORB’s decision. The Army’s

position on this petition, however, raises other issues which illustrate the fundamentally flawed manner in which the petition has been treated.

First, the Army, on this petition, has identified only two of the various rationales discussed above that can be discerned from a review of the record. In addition, it has expressly disavowed any reliance on two of the other rationales as providing a basis in fact for the CORB's decision: that petitioner is insincere because his stated views violate his Hippocratic Oath, and that petitioner's failure to volunteer that he is opposed to abortion evidences that he is not sincerely opposed to war. These rationales were not mentioned in the Army's brief and, at oral argument, the Army confirmed that it was not advancing them as bases for the CORB's decision. Oral Argument Tr. 39. Of course, given the absence of reasons from the CORB, it is not possible to know whether these rationales found in the record, that even the Army declines to advance as sound, were improperly relied upon by the CORB.[12] This precisely illustrates the problem that *Checkman* and *Stewart* addressed.

Second, in support of its second ground – that the CORB "properly concluded" that petitioner is not sincerely opposed to all war – the Army argues that "[d]etermining whether an

---

[12] Two other rationales, upon which reliance would have been improper, are those Colonel Linn cited in finding that petitioner disingenuously applied for CO status. First, the colonel's suggestion that the letters submitted on petitioner's behalf might have been authored by those who had originally recommended that petitioner take " fraudulent approaches" to avoid active duty is completely speculative. A.R. 1 at 26. There are no facts in the record to support such a conclusion. Second, Colonel Linn's concern that "CPT Watson's application is well-counseled and well-written" cannot serve as a legitimate basis in fact for a finding of insincerity. A.R. 1 at 27. Indeed, "an applicant . . . is clearly entitled to be represented by counsel in C.O. proceedings . . . and . . . it is impermissible to allow any negative inference about an applicant's sincerity to be drawn from his attempts to procure legal advice from whatever source." *Goldstein*, 535 F.2d at 1343-44 (holding that a finding of insincerity, based on the fact that an applicant is counseled, is "so infected by ignorance of the law and/or prejudice against the appellant that [it] cast[s] substantial doubt upon all the . . . officer[']s findings and conclusions"). On this petition, the Army has neither advanced Colonel Linn's comments as bases for the CORB's decision nor disavowed them.

applicant's beliefs are sincere is a subjective process." Resp.'s Mem. 20. In doing so, the Army

relies upon instruction from *Witmer v. United States*, in which the Supreme Court explained:

> [T]he ultimate question in conscientious objector cases is the sincerity of the
> registrant in objecting, on religious grounds, to participation in war in any form. In
> these cases, objective facts are relevant only insofar as they help in determining the
> sincerity of the registrant in his claimed belief, purely a subjective question.

348 U.S. at 381-82.

The Army's position that the process of determining whether an applicant should be granted

CO status is subjective implies that the CORB can properly deny a CO application based on its

members' subjective beliefs that an applicant is insincere. This evidences a fundamental misreading

of *Witmer*. In fact, the CORB's evaluation of CO claims cannot be subjective at all; any

determination made by the board must be based on objective, reviewable facts. As the *Witmer* Court

noted, in order to make a finding of insincerity, the Board must rely on "objective facts . . . [that]

cast doubt on the sincerity of [petitioner's] claim."[13] *Id*. at 382. Indeed, the only subjective beliefs

that are relevant to the CO process are those belonging to the applicant, not the reviewer.

Even determinations of credibility based upon direct interaction with an applicant cannot be

subjective but must be based on facts, including, for example, the demeanor of the applicant. Here,

the CORB placed no reliance on petitioner's demeanor. In fact, only two of the officers expressing

---

[13] The facts underlying the *Witmer* decision illustrate the point. There the Court upheld the
CORB's denial of Witmer's application for CO status only after reviewing objective evidence on
which the board based its decision. After noting that Witmer "stated his beliefs with apparent
sincerity" the Court went on to examine the objective facts that were before the board and concluded
that they did in fact cast doubt on the sincerity of his claim. *Id*. at 382. Specifically, the Court noted
that Witmer had applied for exemption from military service on two occasions before submitting
his application for CO status, and, in those previous materials, made statements inconsistent with
his claim of objection to all warfare. Ultimately, the Court concluded that the "inconsistent
statements in themselves" constituted "competent evidence against Witmer's claimed classification
. . . ." *Id*. at 382-83.

an opinion as to whether petitioner's application should be granted actually met with the petitioner.[14] As described above, the chaplain indicated that he "might" have found petitioner sincere had petitioner volunteered that he was opposed to abortion. In arriving at his conclusion, the chaplain cited to no evidence regarding petitioner's demeanor. The second officer who met with petitioner was investigating officer Colonel O'Neill, who, after holding an informal hearing, found that petitioner was sincere and concluded that his application should be granted. Though Colonel O'Neill did not specifically refer to petitioner's demeanor during the hearing, he expressly found that:

> CPT Watson is sincere in his moral and ethical beliefs. *All evidence gathered in the conduct of this investigation* indicates that he is consistent in his beliefs and that he is deeply convicted as to how he feels and conducts himself from day to day.

A.R. 2 at 5 (emphasis added). "Great weight must be accorded to favorable observations and recommendations of sincerity submitted by officers who have, pursuant to regulation, personally interviewed a conscientious objector applicant." *Ferrand*, 488 F.2d at 1390. Accordingly, there is no basis in fact in the record to find that petitioner's demeanor undermined his credibility.

## VI.    Remand

On oral argument, the Army, citing the remand in *Checkman*, belatedly requested that, if the CORB's reasons were found to be insufficiently stated, the court remand this matter to the CORB so that it might expound on its reasoning. Oral Argument Tr. 18, 25-26. Since, as set forth in the text above, none of the factual bases to which the Army has pointed in support of the CORB's conclusion are sufficient to provide a valid basis in fact for denial, even had the CORB specifically

---

[14] A third officer who met with petitioner – the physician – merely concluded that petitioner was mentally capable of participating in the CO process.

stated them in its memorandum, there is no sound reason for a remand.[15]  *See United States ex rel.*

*Coates v. Laird*, 494 F.2d 709, 712 (4th Cir. 1974) (noting that remand is unnecessary where "the

record shows that there is 'no basis in fact' for denial on any valid ground").

## CONCLUSION

For the reasons set forth above, I find no basis in fact for the CORB's conclusion that

petitioner failed to qualify for CO status.  Accordingly, the CORB's denial of petitioner's

application for discharge was unlawful, and petitioner's application for a writ of habeas corpus is

granted.  Respondent is ordered to grant petitioner's application for CO status and release him

through immediate discharge.

**SO ORDERED.**

_____/s/_____

**NINA GERSHON**
**United States District Judge**

Dated:  Brooklyn, New York
        April 10, 2007

---

[15]    I note that *Checkman* in fact rejected a remand for the purpose of allowing a reconstruction of the reasons for the board's classification decision, but remanded the case to the District Court with instructions to "grant appellant's petition four weeks hence . . . unless within that time the Government arranges for a new CORB consideration and processing on a basis that is shorn of the errors identified above." 469 F.2d at 787-788.  The court provided no reasoning for affording the CORB a second chance to properly evaluate Checkman's application, but since, in that case, the Second Circuit addressed the CORB's obligations, in detail, for the first time, it may have thought it appropriate to afford the Army an opportunity to comply with its newly articulated charge.  *Cf. Hammond v. Lenfest*, 398 F.2d 705, 718 (2d Cir. 1968) (limiting relief by directing that the military reconsider its decision in light of and in accordance with "recently adopted new regulations" that implemented procedures more favorable to CO applicants); *United States ex rel. Mankiewicz v. Ray*, 399 F.2d 900 (2d Cir. 1968) (same).  The same consideration does not apply here.  It has been 35 years since *Checkman* was decided and it can no longer be argued that the obligations announced there are novel.  In short, the Army has had ample time to ensure that its review boards provide sufficient reasoning for their decisions.  The CORB's failure to do so here, therefore, cannot be a ground for a remand.  *See Kemp v. Bradley*, 457 F.2d 627, 630 (8th Cir. 1972) (declining to remand to the Army for its reconsideration because, unlike in *Hammond* and *Mankiewicz*, "no change of standard is involved in the instant case, but rather the Army's misapplication of existing standards").